# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| RONESHA BUTLER<br><br>Plaintiff,<br><br>v.<br><br>MARY JO WHITE, CHAIR, SECURITIES<br>AND EXCHANGE COMMISSION,<br><br>Defendant. | Civ. A. No. 11-574 (RCL) |

## MEMORANDUM OPINION

Before the Court is defendant Securities and Exchange Commission's ("SEC") motion for leave to file an amended answer [55] ("Def.'s Mot. Am." 1), plaintiff Ronesha Butler's opposition [59] ("Pl.'s Opp'n to Mot. Am."), and the SEC's reply [60] ("Def.'s Reply Re: Mot. Am."). Also before the Court is defendant's renewed motion for summary judgment [39] ("Def.'s Mot. Summ. J."), plaintiff's opposition [44] ("Pl.'s Opp'n to Summ. J."), and defendant's reply [57] ("Def.'s Reply Re: Summ. J."). Upon consideration of the parties' arguments, the applicable law, and the entire record herein, the Court will GRANT defendant's motion to amend its answer, DENY plaintiff's requests for additional discovery and attorneys' fees, and GRANT defendant's motion for summary judgment.

## BACKGROUND

Plaintiff Ronesha Butler, a black attorney, was hired by the SEC in 2003 as an attorney advisor. Compl. ¶¶ 9-10. She was later promoted to Senior Counsel in the SEC's Office of Market Supervision ("OMS"), within the Trading and Markets Division. *Id.* From 2003 until 2008, OMS Assistant Director Nancy Burke-Sanow, a Caucasian woman, supervised Butler. *Id.*

In March 2005, Butler informed Burke-Sanow that she was pregnant, and Burke-Sanow responded, "Oh so, what are you going to do?" Butler Aff. Ex. 27 at ¶ 2. She later had another employee ask if Butler wanted a baby shower, which was customary at the SEC. *Id.* Butler perceived these comments to be racially charged. *Id.* When Butler subsequently requested four months of maternity leave, Burke-Sanow required Butler to fill out daily leave requests, rather than asking for a simpler extended leave form. Compl. ¶¶ 16-18.

When Butler returned to the SEC after her maternity leave, she was assigned administrative tasks she considered "junk work." *Id.* ¶ 44. She began teleworking two days per month, and on several occasions between August 2005 and October 2006, Burke-Sanow questioned Butler about whether Butler was actually working or caring for her daughter. Compl. ¶ 35. As a result of the questioning, Butler stopped teleworking. Compl. ¶ 41.

In May 2006, the Assistant Directors, including Burke-Sanow, gave recommendations to the Associate Directors regarding merit pay raises for the May 2005 to April 2006 period. *Id.* ¶ 50. Although Butler received an overall acceptable rating for the period, she did not receive a merit pay increase as is customary. *Id.* at ¶ 51. These pay increases have previously been the subject of litigation between the SEC and the National Treasury Employees Union. In 2008, the SEC awarded the union $2.7 million as part of a settlement agreement remedying the denial of merit-step increases from 2003-2007 to black employees and employees over the age of 40. Def.'s Mot. Summ. J. Ex. 42. Butler was awarded a $1,669 increase to her base salary as well as a $3,517.74 one-time cash payment as part of the settlement agreement. Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts 27.

Butler alleges several other instances of perceived hostility throughout this time period, such as making racially-charged comments about her mother, subjecting her work to great

2

scrutiny, and making disparaging comments about her to her peers. Compl. ¶¶ 20, 26, 29-30. The Court addresses these in greater detail in its analysis.

On January 24, 2007, Butler filed an EEO administrative complaint against the SEC alleging that she had been subjected to racial discrimination and a hostile work environment. Compl. ¶ 64. Butler alleges that Burke-Sanow retaliated against her during these proceedings by reducing the substantive work she received as well as the overall quantity of her work. *Id.* ¶ 68. She was removed from working on multiple projects. *Id.* ¶ 71. She claims that at times she had no work, despite going door-to-door and emailing supervisors asking for work. Butler Dep. Ex. 13 at 36.

After exhausting her administrative remedies with the EEO, Butler received a right to sue letter allowing her to bring her suit in district court. On March 21, 2011, Butler filed her complaint in district court alleging harassment and discrimination on the basis of race, and retaliation. *Id.* at 2. Defendant's motion to dismiss was denied. *See Butler v. Schapiro*, 839 F. Supp. 2d 252, 259 (D.D.C. 2012). The Court now considers defendant's renewed Motion for Summary Judgment and Motion to Amend its Answer.

## ANALYSIS

### I.    Defendant's Motion to Amend Its Answer

Before the Court is defendant's motion to amend its answer. The Court considers first whether the opportunity to amend has been waived under Rule 8(c) as interpreted by the D.C. Circuit in *Harris v. Secretary, U.S. Department of Veterans Affairs*, 126 F.3d 339, 343-45 (D.C. Cir. 1997). Finding that it has not, the Court next considers whether the factors laid out by the Supreme Court in *Foman v. Davis*, 371 U.S. 178, 182 (1962) warrant refusing amendment.

Again finding that they do not, the Court will accordingly grant defendant's motion to amend its answer and deny plaintiff's request for additional discovery and associated attorneys' fees.

### A.     Legal Standard for Rule 15(a) Amendment

The District Court "shall freely give[] leave to amend the pleadings under Rule 15(a) when justice requires." *Harris*, 126 F.3d at 345; *see also* Fed. R. Civ. Pro. 15(a)(2). The Court makes this determination "on a case by case basis." *Harris*, 126 F.3d at 344. Indeed, "the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is [an abuse of discretion]." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Justification may be shown through "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Id.* at 182. This loose standard for allowing amendment is consistent with the spirit of the Federal Rules in that it "facilitate[s] a proper decision on the merits" rather than making "pleading a game of skill in which one misstep by counsel may be decisive to the outcome." *Id.* at 181-82 (internal quotation marks and citation omitted). Thus, it follows that the party opposing amendment has the burden of convincing the Court why the amendment should not be granted. *E.g.*, *Morgan v. Fed. Aviation Admin.*, 262 F.R.D. 5, 8 (D.D.C. 2009) (plaintiff has burden of proof where defendant moves to amend answer under 15(a)); *Smith v. Cafe Asia*, 598 F. Supp. 2d 45, 48 (D.D.C. 2009) (defendant has burden of proof where plaintiff moves to amend complaint under 15(a)); *see also Gudavich v. District of Columbia*, 22 Fed. App'x 17, 18 (D.C. Cir. 2001) (noting that non-movant "failed to show prejudice from the district court's action in allowing the [movant's] motion to amend").

### B.     Forfeiture of Affirmative Defenses Under Rule 8(c)

Plaintiff's chief argument in opposition to amendment is that defendant has forfeited[1] the affirmative defenses in question by consistently failing to plead them or amend its answer to state them. *See generally* Pl.'s Opp'n to Def.'s Mot. for Leave to Amend Answer. Plaintiff draws the Court's attention to *Harris v. Secretary, U.S. Department of Veterans Affairs* for the proposition that "a party's failure to plead an affirmative defense . . . generally results in the waiver of that defense and its exclusion from the case," and that under Rule 8(c) "a party must first raise its affirmative defenses in a responsive pleading before it can raise them in a dispositive motion." 126 F.3d 339, 343, 345 (D.C. Cir. 1997) (internal quotation marks and citations omitted). *Harris* suggests that the pleading requirements of Rule 8 are designed to provide notice to the parties, and rejects the practice of other circuits permitting parties "to raise affirmative defenses for the first time in dispositive motions where no prejudice is shown." *Id.* at 344 (citing, *e.g.*, *Blaney v. United States*, 34 F.3d 509, 512 (7th Cir. 1994)). *Harris* finds that this practice "subtly alters the structure dictated by Rules 8(c) and 15(a)" by (1) permitting parties to strategically avoid giving notice until later in the litigation process and (2) allowing the district court to weigh only undue prejudice rather than considering all of the potential factors listed in *Foman* that may weigh against amendment. *Id.* Instead, *Harris* requires that "the District Court await a request for leave to amend" before considering an affirmative defense not originally raised in the pleadings. *Id.* at 345. Requiring amendment provides the nonmoving party notice of a new affirmative defense and an opportunity to conduct discovery in order to

---

[1] Plaintiff's attempt to characterize defendant's actions as an intentional waiver rather than a curable forfeiture does not stand. *See generally United States v. Olano*, 507 U.S. 725, 733 (1993) ("Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right."); *see also Harris*, 126 F.3d at 343 n.2 ("[I]f a party 'waives,' i.e., intentionally relinquishes or abandons an affirmative defense, no cure is available under Rule 15."). Defendant cannot knowingly give up a defense it does not know it has. *See* I.C., *infra* (finding defendant was unaware of facts necessary to plead affirmative defense until 2013).

establish a proper counter. *Id.* It also ensures that each *Foman* factor is given its due weight. *See id.*

This Court interprets *Harris* in the context of the present circumstances. Here, defendant has moved to amend its answer to add the affirmative defenses of "arbitrage and award" and "release." Def.'s Mot. to Amend 1. Generally, there would be no question about allowing such amendment under the forgiving standard of Rule 15(a). Here, however, defendant argued the affirmative defenses in its renewed motion for summary judgment—filed *before* defendant moved to amend its answer—and thus plaintiff challenges the validity of amendment. Essentially, plaintiff argues that *Harris* precludes amendment where defendant moves to amend its answer to add affirmative defenses after first arguing them in a summary judgment motion, but before the Court's decision on that dispositive motion. The Court disagrees with this interpretation. It is clearly the motion to amend that is crucial, not its timing. *Harris*, 126 F.3d at 343 n.2 ("A Rule 15 amendment, if allowed by the trial court, will cure any problem of timeliness associated with forfeiture . . . ."); *see also* 6 Wright, Miller, & Kane, *Federal Practice & Procedure*, § 1488 (3d ed. 2014) ("Quite appropriately the courts have not imposed any arbitrary timing restrictions on requests for leave to amend and permission has been granted under Rule 15(a) at various stages of the litigation"). Indeed, in a procedural scenario identical to this one, Judge Bates held that moving to amend even after first arguing an affirmative defense at the summary judgment stage was permissible under *Harris*. *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 91-92 (D.D.C. 2005). If defendant had argued the affirmative defenses in its dispositive motion but never filed a motion to amend, *Harris* would certainly call for the forfeiture of defendant's affirmative defenses. *See, e.g.*, *Lerner v. District of Columbia*, 362 F. Supp. 2d 149, 162-63 (D.D.C. 2005). But because defendant has moved for leave to amend, this

Court will consider each of the factors in *Foman*, including undue delay, bad faith, failure to cure deficiencies, and futility of amendment in addition to undue prejudice before allowing or denying amendment.

### C.     *Foman* Factors

To successfully resist amendment, plaintiff must show "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman*, 371 U.S. at 182. Plaintiff's opposition emphasizes potential undue prejudice and undue delay, while also implying bad faith. Pl.'s Opp'n to Mot. Amend 3-5. No amendments were previously requested or allowed, and amendment here would be substantive and certainly not futile; thus, these final two factors are not applicable to the Court's analysis.

Of the *Foman* factors, courts generally consider the "most important factor" to be "the possibility of prejudice to the opposing party." *Djourabchi v. Self*, 240 F.R.D. 5, 13 (D.D.C. 2006). To demonstrate "prejudice sufficient to justify a denial of leave to amend the 'opposing party must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the amendments been timely.'" *In re Vitamins Antitrust Litig.*, 217 F.R.D. 30, 32 (D.D.C. 2003) (quoting *Dooley v. United Techs. Corp.*, 152 F.R.D. 419, 425 (D.D.C. 1993)) (internal quotation marks and citations omitted)). When ample time remains in discovery, a motion to amend usually does not create prejudice; however, when there is little time remaining or discovery has closed, the question often hinges on whether the amended pleading seeks to introduce new issues that would require additional discovery. *See Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 247-48 (D.C. Cir. 1987); *see also Becker v. District of Columbia*, 258 F.R.D. 182, 184-85 (D.D.C. 2009). Even if

new discovery would be required, the Court may exercise its discretion to allow amendment, and mitigate any resulting prejudice by awarding attorneys' fees and other costs if appropriate. *See* Wright, Miller, & Kane, *supra*, § 1488 n.27 (citing *Amquip Corp. v. Admiral Ins. Co.*, 231 F.R.D. 197 (E.D. Pa. 2005)).

Moreover, "[undue] delay without resulting prejudice . . . is not sufficient to warrant denial of [amendment]." *In re Vitamins*, 217 F.R.D. at 33; Wright, Miller, & Kane, *supra*, § 1488 ("In most cases, delay alone is not a sufficient reason for denying leave."). Providing "sound reason" may mitigate the effect of a substantial delay, *see Becker*, 258 F.R.D. at 185 (quoting *Doe v. McMillan*, 566 F.2d 713, 720 (D.C. Cir. 1977)); *Shea v. Clinton*, 288 F.R.D. 1, 6-8 (D.D.C. 2012), just as providing notice of intent to plead an affirmative defense makes delay less prejudicial, *see, e.g.*, *Harris*, 126 F.3d at 343-45; *Jackson v. District of Columbia*, 254 F.3d 262, 267 (D.C. Cir. 2001).

Plaintiff spends approximately half a page of her opposition making conclusory statements about the prejudice that would result should the Court allow amendment. Pl.'s Opp'n to Mot. Amend 5. This hardly meets the standard of showing what specific facts or evidence plaintiff has been deprived from uncovering through discovery. *See Vitamins*, 217 F.R.D. at 32. Absent this explanation, it is not immediately obvious to the Court what plaintiff could possibly learn through discovery that would alter the legal question before the Court. Plaintiff has already conceded the only potentially disputable factual issue: that she did receive compensation and a salary increase as part of the arbitration agreement. Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts, ECF No. 44-1 at 27. Thus, if amendment is allowed, the only question for the Court to decide is whether the arbitration award is an effective means of preclusion for this case, which will require some interpretation of statutory terms and an

examination of legal precedent. The Court is equipped to perform this analysis at this time, *see* II.B.1, *infra*, and as such the additional discovery requested by plaintiff is unnecessary and will be denied. This finding indicates that there is no prejudice and that amendment should be permitted, but, to be sure, the Court continues its analysis.

While plaintiff makes much of the fact that she informed defendant of the arbitration decision from the outset of this litigation, *e.g.*, Pl.'s Opp'n to Mot. Amend 2-4 (emphasizing "over two and a half years" ago), the Court finds it somewhat duplicitous that plaintiff would seek to use the strong language of the arbitration decision without also disclosing that plaintiff was compensated for that wrongful action. *Compare* ECF No. 9-22 (Sept. 9, 2011) (first appearance in docket of arbitration decision condemning SEC practices as "blatant[ly] disparate"), *with* ECF No. 43-42 (Mar. 10, 2014) (first appearance in docket of settlement agreement for arbitration decision with compensation schedule that included plaintiff). The earliest evidence that defendant knew plaintiff was compensated under the arbitration decision is from February 26, 2013. *See* Letter from Def. Counsel, February 26, 2013, ECF No. 59-4; *see also* Def.'s Reply Re: Mot. Amend 3-4 (explaining that defendant "promptly raised the issue with plaintiff" after discovering plaintiff was compensated as part of arbitration decision). Plaintiff then argues that even if that is true, defendant's year-long delay to amend is inexcusable. Pl.'s Opp'n to Mot. Amend 3-5. Defendant counters that it was making a litigation decision. Def.'s Reply Re: Mot. Summ. J. 5-6. However, the point is moot because undue delay without prejudice is not sufficient to deny amendment, *see Vitamins* 217 F.R.D. at 33, and absence of a justifying explanation does not immediately indicate a bad faith motive for delay. The Court finds that plaintiff was not unduly prejudiced by this delay, primarily because plaintiff was made aware that defendant intended to plead this affirmative defense on February 26, 2013,

9

and indeed responded with a full-fledged argument on March 22, 2013. *See* Letter from Pl.'s Counsel, March 22, 2013, ECF No. 59-5. Moreover, discovery did not close until September 16, 2013. *See* ECF No. 32 (August 14, 2013 order extending discovery deadline by 33 days). Plaintiff had more than enough time to reshape her discovery inquiries to address this issue after receiving defendant's notice, but apparently chose not to do so at that time. This fact undermines her claims to prejudice and requests for additional discovery. There is no undue prejudice standing in the way of considering the merits of defendant's affirmative defense, and the Court will thus grant defendant's Rule 15 motion to amend to add the affirmative defenses of arbitrage and award and release, and deny plaintiff's request for additional discovery and associated attorneys' fees.

## II. Defendant's Motion for Summary Judgment

On defendant's motion for summary judgment, the Court is presented with a number of legal issues. Plaintiff alleges three counts of title VII discrimination in her complaint: (1) discriminatory denial of pay raise based on race, (2) harassment based on race, and (3) reprisal for filing a complaint. Compl. ¶¶ 12-14.

### A. Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The movant may successfully support its motion by "informing the district court of the basis for its motion, and identifying the portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

A fact is material if it could affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," on a motion for summary judgment. *Id.* However, if the non-movant's "evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50. The non-movant must present more than a "mere . . . scintilla of evidence" to avoid summary judgment. *Id.* at 252. Indeed, "[c]onclusory allegations unsupported by factual data will not create a triable issue of fact." *Pub. Health Research Grp. v. FDA*, 185 F.3d 898, 908 (D.C. Cir. 1999).

## B. Plaintiff's Claims

Plaintiff alleges three counts of title VII discrimination in her complaint: (1) discriminatory denial of pay raise based on race, (2) harassment based on race, and (3) reprisal for filing a complaint. Compl. ¶¶ 78-91. The Court will consider each of plaintiff's claims to determine on which counts there exists a genuine dispute as to material fact that must proceed to trial.

### 1. Denial of Pay Raise Based on Race

The most hotly contested issue in this case is plaintiff's allegation that the SEC discriminated against her based on her race when she was denied a merit-step pay increase in 2006. Because the Court has permitted amendment under Rule 15(a) to add defendant's

affirmative defenses of arbitration and award and release, the dispositive question is whether the 2008 arbitration settlement between plaintiff's union, the National Treasury Employer's Union ("NTEU"), and plaintiff's employer, the SEC, precludes plaintiff from litigating the discrimination issue at hand. Plaintiff first disputes that she is bound by the settlement agreement because she, individually, never filed a grievance with the NTEU and that the facts of her specific case were neither investigated nor considered in the final arbitration decision or settlement agreement. Second, she claims that even if the agreement is applicable, it does not extend to her intentional discrimination claim regarding merit-step increases.

The Court first considers whether the settlement agreement applies to plaintiff. In its collective bargaining agreement with the SEC, the NTEU was designated the "exclusive representative" of all SEC employees, with few exceptions. *See* ECF No. 42-42. As the exclusive representative, the union may file grievances on behalf of SEC employees. *See* 5 U.S.C. § 7121(b)(1)(C). A "grievance" is any complaint--

> **(A)** by any employee concerning any matter relating to the employment of the employee;
>
> **(B)** by any labor organization concerning any matter relating to the employment of any employee; or
>
> **(C)** by any employee, labor organization, or agency concerning--
>
>> **(i)** the effect or interpretation, or a claim of breach, of a collective bargaining agreement; or
>>
>> **(ii)** any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment.

5 U.S.C. § 7103(a)(9).

Generally, "[a]n aggrieved employee affected by a prohibited personnel practice . . . may raise the matter under either a statutory procedure [EEOC complaint] or the negotiated procedure [filing a grievance], but not both." 5 U.S.C. § 7121(d). The simple filing of a grievance by the union, even without the employee's consent, may amount to an irrevocable election of remedies

by the member. *Wright v. Snow*, 2006 WL 1663490 at *6-7 (D.D.C. June 14, 2006). In this case, the initial grievance by the union was filed as a "national grievance 'on behalf of NTEU and all affected bargaining unit employees,'" seeking remedies including "[t]hat all affected employees be awarded up to three merit step increases." ECF No. 9-22 at 1-4. "Affected employees" were those denied a merit step increase between 2003 and 2007. Plaintiff, as a black SEC employee denied a merit-step increase in 2006, falls into the "affected" category. Thus, the suit was brought by her union on her behalf and its legal resolution is binding on her.

Having decided its effect on plaintiff, the Court now decides whether the agreement precludes litigating intentional discrimination claims related to merit-step increases. The key to resolving this issue is to examine the precise terms used in the agreement between the SEC and the NTEU and determine how they apply to plaintiff. *See, e.g., Gonzalez v. Dep't of Labor*, 603 F. Supp. 2d 137, 142-45 (D.D.C 2009) (interpreting terms of settlement agreement). Accordingly, the Court turns to contract law to guide its interpretation. *See id.* at 143 (citing *Makins v. District of Columbia*, 277 F.3d 544, 546 (D.C. Cir. 2002). "When interpreting a contract, the plain language and mutual intent of the parties are paramount." *Id.* (citing *Mesa Air Group, Inc. v. Dep't of Transp.*, 87 F.3d 498, 503 (D.C. Cir. 1989)).

The settlement agreement between the SEC and the NTEU "settles all issues raised in the national merit pay grievances covering contribution years 2003 through 2007, filed by NTEU on January 8, 2004." ECF No. 42-43 at 9. Although the arbitrator found it unnecessary to address the issue of intentional discrimination, ECF No. 9-22 at 94, the "NTEU agree[d] that it will not raise the issues contained in the grievances in any other forum," ECF No. 42-43 at 9. Based on the "plain language" of the agreement, the denial of merit-step increases was its central point, and this agreement settled any potential litigation arising from that injury, including intentional

discrimination. *See Gonzalez*, 603 F. Supp. 2d at 144-45. Moreover, if plaintiff's theories regarding her ability to litigate this issue were credited, then every SEC employee who was denied a merit-step increase for what they perceived to be intentional discrimination would be entitled to bring a lawsuit as well. This cannot have been the intent of the settlement agreement. If the parties intended to reserve the rights of individual SEC employees to sue on certain issues, then they likely would have stipulated to that effect in the agreement. *Id.* at 144 (finding the parties intended to settle all claims "in the absence of clear language to the contrary"). The Court therefore finds that the sweeping term "all issues" includes every wrongful action related to the denial of merit-step increases from 2003-2007. Because discrimination against black SEC employees in determining merit-step increases was one of the issues considered in the grievances filed by the NTEU, and "all issues" related to the grievances including the denial of merit-step increases from 2003-2007 have been settled, plaintiff is precluded from alleging intentional discrimination for the denial of a 2006 merit-step increase in this or any court.

Furthermore, plaintiff was compensated as part of the settlement agreement for the SEC's denial of her 2006 merit-step increase. Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts, ECF No. 44-1 at 27 (conceding that plaintiff received a $1,669 increase to her base salary as well as a $3,517.74 one-time cash payment as part of the settlement agreement). She now seeks to recover on an intentional discrimination theory for the same denial of her 2006 merit-step increase. However, "it goes without saying that the courts can and should preclude double recovery by an individual." *Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 333 (1980). The Supreme Court has noted that in factual scenarios like this one, "where [a labor representative] has prevailed in [a representative] action, the court may reasonably require any individual who claims under its judgment to relinquish his right to bring a separate private action." *Id.* at 333.

Here, plaintiff accepted compensation under the NTEU settlement agreement but now brings a "separate private action" involving the exact injury she was compensated for already. This is contrary to general principles of equity and fairness as well as the Supreme Court's mandate. The Court will accordingly enter summary judgment in favor of defendant in regard to count II of plaintiff's complaint: intentional racial discrimination based on the denial of her 2006 merit-step increase.

### 2. Harassment Based on Race

#### a. *Legal Standard*

Count I of plaintiff's complaint alleges harassment based on plaintiff's race. Title VII provides that it is "unlawful for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

Title VII discrimination claims have traditionally followed the burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Brady*, 520 F.3d at 493-94. A plaintiff has the burden of establishing a prima facie case of discrimination by a preponderance of the evidence. *Id.* at 802. To establish a prima facie case of discrimination, a plaintiff must demonstrate that (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 89 (D.D.C. 2005*) aff'd sub nom. Nurriddin v. Griffin*, 222 F. App'x 5 (D.C. Cir. 2007).

If the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802. The employer's burden is one of production and "[i]t is sufficient if the defendant's

evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). If the employer is successful, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination or retaliation. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, (2000). Although the "intermediate evidentiary burdens shift back and forth" under the McDonnell Douglas framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 143 (quoting *Burdine*, 450 U.S. at 253).

Hostile work environment claims "are based on the cumulative effect of individual acts." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). The Supreme Court has instructed that Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). A hostile work environment must be both objectively and subjectively hostile. *Id.* at 21. "This standard . . . takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Id.* The Supreme Court also set out the appropriate inquiry:

> [W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Id.* at 23. Generally, "isolated incidents," "offhand comments," and "simple teasing" "will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v.*

*City of Boca Raton*, 524 U.S. 775, 788 (1998). Title VII does not make actionable offenses arising from "the ordinary tribulations of the workplace." *Id.* (citation and internal quotation marks omitted).

### b. *Plaintiff's Allegations*

Considering the applicable law, the Court is presented with three potentially dispositive questions on defendant's motion for summary judgment: first, does plaintiff present sufficient evidence of the alleged conduct? Second, assuming that all the alleged conduct that survived the evidentiary bar is true, would a reasonable jury be able to conclude that the conduct was collectively "severe and pervasive" such that it altered the terms or conditions of plaintiff's employment? Third, does plaintiff present evidence such that a reasonable jury could conclude that the severe and pervasive conduct was racially motivated?

#### i. *Plaintiff's Evidence and Allegations*

Plaintiff alleges that "over the course of one year," defendant subjected her to ten different kinds of harassment. *See* Pl.'s Opp'n to Mot. Summ. J. 25.

(1) Burke-Sanow "[required] Plaintiff to fill out dozens of pages of unnecessary bureaucratic paperwork prior to taking maternity leave (*see* Ex. 13 at 17-18)." Pl.'s Opp'n to Mot. Summ. J. 25. Defendant provides evidence that, on the contrary, plaintiff filled out leave slips according to SEC policy. Butler was only required to fill out a new leave slip when the type of leave she planned to take changed. *See* Woodland Dep. 51-54, ECF No. 42-20; Butler Leave Slips, ECF No. 42-21; Burke-Sanow Dep. 69-71, ECF No. 50-16. Indeed, she filled out 30 leave slips for 108 days of maternity leave. *See* Butler Leave Slips, ECF No. 42-21. The Court considers this evidence as defendant presented.

(2) Burke-Sanow "[failed] to provide Plaintiff with appropriate Agency-required paperwork prior to her maternity leave resulting in her incurring unnecessary debts to the Agency (*see* [Ex. 13 at 17-18])." Pl.'s Opp'n to Mot. Summ. J. 25. Whether filling out maternity leave paperwork caused plaintiff to incur unnecessary debts to the SEC is not refuted by defendant, so it will be assumed for summary judgment purposes.

(3) Burke-Sanow "[kept] a notebook of negative comments regarding Plaintiff and her work product (*see* Ex. 1 at 204-05)." Pl.'s Opp'n to Mot. Summ. J. 25. This is a mischaracterization of the evidence. Burke-Sanow testified that she kept notes of plaintiff as well as other employees, and there is no indication from the testimony that these notes were negative. *See* Burke-Sanow Dep. II at 204-05, ECF No. 50-1. The Court will treat this claim accordingly for purposes of summary judgment.

(4) Burke-Sanow "[made] numerous racially charged comments about Plaintiff and her mother (*see* Ex. 2 at 98)." Pl.'s Opp'n to Mot. Summ. J. 25. Defendant disputes that the comments were racially charged, but concedes that the underlying conversations did occur. Particularly, plaintiff claims that Burke-Sanow said that plaintiff's mother, who was changing jobs, could be a "secretary" rather than an "administrator," and that she could teach at "community college" rather than "Georgetown." Butler Dep. 56-57, ECF No. 50-6. Burke-Sanow also said that she did not know plaintiff's mother was a "real nurse," when in fact she was a "registered nurse." *Id.* Regarding plaintiff herself, when plaintiff mentioned that she was pregnant, Burke-Sanow said "oh, so what are you going to do?" and had an employee ask if plaintiff wanted a baby shower, which was customary at the SEC. Butler Aff. Ex. 27 at ¶ 2. Plaintiff interpreted these interactions as racially charged. The Court will assume that the

underlying facts were as plaintiff suggests, but reserve any inference of racial animus until later in its analysis.

(5) Burke-Sanow "[criticized] the amount of time plaintiff spent on Agency sponsored civil-rights projects without cause (*see* [Ex. 2] at 79-81, 84)." Pl.'s Opp'n to Mot. Summ. J. 25. Plaintiff also alleges that Burke-Sanow "checked up" on her work with the African-American Council by calling Deborah Balducchi, EEO Office director. *Id.* at 26. Defendant disputes that Burke-Sanow's call was in regard to plaintiff specifically, but cannot disprove plaintiff's claims with evidence. Although Balducchi doesn't remember any specific call, and generally calls regarding employee participation in such diversity programs are appropriate, *see* Balducchi Decl. ¶¶ 2-3, ECF No. 42-12, for purposes of summary judgment the Court will assume that the facts are as plaintiff alleges.

(6) Burke-Sanow "repeatedly question[ed] Plaintiff and her co-workers about her work habits (*see* [Ex. 2] at 22-24, 36-37; Ex. 3 [at] 14, 17)." Pl.'s Opp'n to Mot. Summ. J. 25. Defendant disputes this on factual grounds. Plaintiff's specific allegations are that Burke-Sanow "intimated" some kind of problem with plaintiff to Susie Cho and Mark McKayle. Both Cho and McKayle have given sworn statements that Burke-Sanow did not make any disparaging comments about plaintiff. *Id.* at 24; McKayle Decl. ¶ 3, ECF No. 42-10. Susie Cho has stated she "most likely did not say" that conversations with Burke-Sanow about plaintiff made her uncomfortable. Cho Dep. 25, ECF No. 42-9. At most, McKayle found one instance of Burke-Sanow calling to inquire about plaintiff to be "unusual," but not rising to the point of making him "uncomfortable." McKayle Dep. 20, ECF No. 42-11. However, defendant has shown through competent evidence that Burke-Sanow called McKayle regarding plaintiff rather than the designated supervisor because she could not reach that supervisor. Burke-Sanow Dep. 119-31,

ECF No. 42-4; *see* McKayle Decl. ¶ 4, ECF No, 42-10. These are the only employees that plaintiff cites for her allegation, and their sworn testimony does nothing to support plaintiff's inference that Burke-Sanow "repeatedly" questioned plaintiff's co-workers about her. The Court will treat the facts accordingly.

(7) Burke-Sanow "inquir[ed] about Plaintiff's performance, quality[,] and timeliness to her peers, other supervising attorneys[,] and Agency employees." Pl.'s Opp'n to Mot. Summ. J. 25. There is no citation to the record to support this allegation, so the Court assumes it was meant to be encompassed in the previous, similar, allegation, and treats it accordingly.

(8) Burke-Sanow "subject[ed] Plaintiff to higher scrutiny in regards to her work product and telecommuting requests than that of Plaintiff's non-African American peers (*see* Ex. 2 at 148; Ex. 6 at 15, 30)." Pl.'s Opp'n to Mot. Summ. J 25. Defendant provides evidence that Burke-Sanow's interactions with plaintiff regarding telework were in accordance with SEC policy, and that Burke-Sanow also followed up on her other employee's telework requests. The telework policy states:

> On the day preceding each telecommute day, I will e-mail my supervisor with a description of the projects that I propose to work on while telecommuting. On my first day back at the office, I will e-mail my supervisor to describe the status of those projects and what I accomplished while telecommuting.

Telework Agreement 9, ECF No. 42-13. Burke-Sanow sent e-mails reminding plaintiff to send in the required telework e-mails five times over the course of a year of teleworking. *See* Butler Dep. 153-56, ECF No. 50-2. She sent our of the emails because plaintiff had forgotten to comply with the policy, and one because Burke-Sanow was leaving early. *See* Telework E-mails I, ECF No. 42-15; Telework E-mails II, ECF No. 42-16. The only written evidence of Burke-Sanow's interactions with others regarding telework, these e-mails, shows that she was consistent among all employees when asking for explanations for changes in telework schedules, determining

whether employees had sufficient work, and reminding individuals to send in the details of their telework. *See* Telework E-mails I, ECF No. 42-15; Telework E-mails II, ECF No. 42-16. Burke-Sanow also testifies that she followed up with other workers regarding their child-care arrangements during their telework days, which plaintiff is unable to refute. Burke-Sanow Dep. 185, 199, 219-20, ECF No. 42-4. However, plaintiff alleges that Burke-Sanow called plaintiff into her office and went on "tirades" regarding plaintiff's telework, and that this caused plaintiff to stop teleworking. *See* Butler Dep. 123, 148, 154-55, ECF No. 50-2. Defendant disputes this but cannot disprove it, and therefore the Court assumes its truth.

(9) Defendant "subject[ed] Plaintiff to adverse employment actions such as giving Plaintiff a rating of 'zero' for her 2006 merit step increase." Pl.'s Opp'n to Mot. Summ. J. 25. This heavily disputed issue is not relevant because the Court found that all issues related to the denial of plaintiff's merit step increase have been resolved and remedied.

(10) Burke-Sanow "tasked Plaintiff for unappealing administrative assignments while Plaintiff was on maternity leave. *See* Def. Att. 18." Pl.'s Opp'n to Mot. Summ. J. 29. Defendant does not successfully dispute the contention that this was "junk work" that no one wanted to do, *id.*, although defendant does present unrefuted evidence that it was actually another supervisor, Ms. King, who selected plaintiff to perform one of the administrative tasks after Burke-Sanow recommended two potential candidates, including plaintiff. Burke-Sanow Dep. 233-34, ECF No. 42-4.

##### ii. *Severity and Pervasiveness*

Assuming that each of plaintiff's allegations is true, defendant argues that the totality of the circumstances does not rise to the level of severe and pervasive conduct. The Court agrees.

Several cases are illustrative of the high standard for hostile work environment claims. In *George v. Leavitt*, the D.C. Circuit affirmed the district court's denial of plaintiff's hostile work environment claim where the plaintiff from Trinidad and Tobago was told to "go back where she came from" by her co-workers on three occasions. 407 F.3d 405, 416-17 (D.C. Cir. 2005). She advised her supervisor of the incidents, but her supervisor blamed her and took no action. *Id.* at 408. Later, her supervisor advised her co-workers during a meeting that she was "causing problems" and that they should "keep [their] distance from her." *Id.* at 408-09. After an incident in plaintiff's office, her supervisor "angrily kicked a box" on the way out, which frightened plaintiff. *Id.* at 409. The D.C. Circuit ruled that these incidents were the exact kind of "'isolated incidents' that the Supreme Court has held cannot form the basis of a Title VII violation." *Id.* at 417.

In *Singh v. United States House of Representatives*, the plaintiff's supervisor humiliated her at important meetings, was "hostile, patronizing, and frequently abusive," once told her to "shut up and sit down," excluded her from meetings, denied her opportunities for professional growth, isolated her from other staff members, and was generally hypercritical. 300 F. Supp. 2d 48, 54-55 (D.D.C. 2004). Plaintiff was denied a parking spot and denied the opportunity to attend the "ten-day festivities surrounding her daughter's college graduation." *Id.* at 54 (internal quotation marks omitted). Judge Collyer granted defendant's motion for summary judgment, ruling that this conduct was not sufficiently severe and pervasive to create a hostile work environment. *Id.* at 56-57.

Here, there is no evidence that the alleged conduct was sufficiently pervasive or severe such that it altered a term or condition of plaintiff's employment. In fact, the evidence shows that Burke-Sanow's "constant" alleged wrongful actions were actually limited to discreet

instances over the course of more than a year. None of plaintiff's complaints were physical in nature. The most frequently-occurring events plaintiff alleges relate to plaintiff's telework, was limited to six occasions. Likewise, the alleged racially-charged comments Burke-Sanow made regarding plaintiff and plaintiff's mother, while certainly presumptuous and insensitive, were discreet events. Even if they were as racially charged as plaintiff claims, the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee [does] not affect the conditions of employment to sufficiently significant degree to violate Title VII." *Meritor Sav. Bank, FSP v. Vinson*, 477 U.S. 57, 67 (1986) (internal quotation marks and citation omitted). Objectively, a reasonable employee would not consider plaintiff's circumstances severe enough to change the terms and conditions of her employment. Indeed, plaintiff's claims that other employers noticed and commented about Burke-Sanow to plaintiff proved to be uncorroborated and unsupported for the purposes of summary judgment.

Essentially, many of plaintiff's complaints regarding Burke-Sanow related to her management style. Burke-Sanow was picky, thorough, and scrutinized much of plaintiff's work. Plaintiff fails to establish that this did not happen to other employees under Burke-Sanow's charge, and indeed defendant presents evidence demonstrating that Burke-Sanow exercised this level of scrutiny across the board. Objections to a supervisor's management style have generally been held not to constitute a severe and pervasive environment. *See, e.g., Johnson v. Bolden*, 699 F. Supp. 2d 295, 302 (D.D.C. 2010); *Allen v. Napolitano*, 774 F. Supp. 2d 186, 205-06 (D.D.C. 2011). For example, something as innocuous as a supervisor keeping notes on her employees does not have much bearing on whether plaintiff was being actively harassed. Instances where Burke-Sanow said that when she thought of plaintiff she "did not think of a superstar" and described her work as "fine" are "isolated incidents" that are part of the normal

23

tribulations of the workplace. Indeed "[c]riticisms of a subordinate's work and expressions of disapproval . . . are the kinds of normal strains that can occur in any office setting." *Singh*, 300 F. Supp. 2d at 56. Generally, it is not severe conduct to assign "junk jobs," even where such jobs are not assigned to other workers. *Freedman v. MCI Telecomm. Corp.*, 255 F.3d 840, 847-48 (D.C. Cir. 2001). The administrative roles that plaintiff was assigned needed to be performed by somebody in the department, and were certainly not unreasonable interferences with her work performance. Thus, plaintiff being chosen for "junk work" is hardly severe.

All told, the incidents that plaintiff alleges do not give rise to an inference of a severe and pervasive working environment that altered the terms and conditions of her employment. Like in *Singh*, "it appears without doubt that [plaintiff] had a rocky working relationship with [her supervisor]," 300 F. Supp. 2d at 56, but this does not mean that she was the target of discrimination by her supervisor. The Court finds that any hardships plaintiff was subjected to were not sufficiently severe and pervasive for a jury to conclude that plaintiff should succeed on her hostile work environment claim. At most, she was subjected to the "ordinary tribulations of the workplace." *Faragher*, 524 U.S. at 728. Therefore, the Court will grant defendant's motion for summary judgment insofar as it relates to count I of plaintiff's complaint.

### 3.    Retaliation

Plaintiff's third count alleges that she experienced retaliation after filing an EEO complaint on January 24, 2007. Compl. ¶¶ 63-73. Under Title VII, it is

> an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). "Evaluation of Title VII retaliation claims follows the same burden-shifting template as discrimination claims." *Holcomb v. Powell*, 433 F.3d 889, 901 (D.C. Cir.

2006) (citing *Cones v. Shalala*, 199 F.3d 512, 520 (D.C. Cir. 2000)). As with discrimination claims, the D.C. Circuit has instructed that where the defendant has asserted some "legitimate non-retaliatory explanation" for its conduct, "the district court need not—*and should not*— decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (quoting *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)). "The only question is whether the employee's evidence creates a material dispute on the ultimate issue of retaliation 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* (quoting *U.S. Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 716 (1983) (internal quotation marks and citation omitted)). The Court should consider "the three relevant categories of evidence—prima facie, pretext, and any other—to determine whether they 'either separately or in combination' provide sufficient evidence for a reasonable jury to infer retaliation," *id.* at 679 (quoting *Waterhouse v. District of Columbia*, 298 F.3d 989, 996 (D.C. Cir. 2002)), mindful that the "ultimate burden" of persuasion for proving a retaliation claim lies at "all times" with the plaintiff, *Tex. Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

### a.    *Prima Facie Elements for Retaliation Claims*

Prima facie evidence is probative of a plaintiff's retaliation claims, and typically relies on showing that (1) plaintiff engaged in a protected activity, (2) plaintiff suffered a materially adverse employment action perpetrated by her employer, and (3) the adverse action was causally related to the protected activity. *Jones*, 557 F.3d at 677; *Holcomb*, 433 F.3d at 901-02. Here, there is no dispute that plaintiff engaged in a protected activity, so the Court begins by setting out the law for materially adverse employment actions.    The requirement of *material* adversity

emphasizes that courts should distinguish between trivial and significant harms arising during the scope of employment. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). To demonstrate material adversity, a retaliation plaintiff must show that "a reasonable employee would have found the challenged activity materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (quotations omitted). Of course, "Title VII . . . does not set forth 'a general civility code for the American workplace'" by enumerating a specific list of adverse actions. *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). Rather, the Supreme Court instructs the courts to examine the "particular circumstances" and context of each case to determine whether an employer's action would deter a reasonable employee from complaining about discrimination. *Burlington*, 548 U.S. at 69. "[A]n 'act that would be immaterial in some situations is material in others.'" *Id.* (quoting *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 661 (7th Cir. 2005)).

The other relevant element of a prima facie case is causation. The Court of Appeals has held that causation can be inferred through establishing a "close temporal proximity" between a protected activity and the alleged retaliatory conduct. *Cones*, 199 F.3d at 521. Still, "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2521 (2013). This is a more restrictive standard than that applied to standard discrimination claims, and "must be proved according to traditional practices of but-for causation." *Id.* at 2533. This means that plaintiff must prove that her injury would not have occurred "in the absence of the alleged wrongful action or actions of the employer." *Id.* Therefore, plaintiff may establish an inference

of causation through temporal proximity, but in order to succeed must also rule out all other possible explanations of the retaliatory conduct.

### b.    *Plaintiff's Allegations*

Despite defendant's thorough recounting of the applicable legal standard in its motion for summary judgment, *see* Def.'s Mot. Summ. J. 37-38, plaintiff does not put forth any argument that defendant's non-retaliatory explanations are pretextual, *see* Pl.'s Opp'n to Mot. Summ. J. 31-35. Instead, plaintiff addresses the prima facie case and one argument regarding same-actor influence. *Id.* "It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) (citing *FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997)), *aff'd*, 98 Fed. App'x 8 (D.C. Cir. 2004). Although the body of plaintiff's opposition does not address some of the issues defendant raised in its motion, plaintiff's response to defendant's statement of undisputed material facts does contain some of the factual issues plaintiff failed to address in her opposition. *See generally* Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 76-99. Accordingly, the Court will take defendant's uncontested arguments at face-value so long as they do not conflict with the facts in the record, but will also address plaintiff's disputes as to the material facts.

Plaintiff alleged in her complaint that "[s]ubsequent to depositions taking place in [plaintiff's] administrative complaint, Ms. Burke-Sanow removed [plaintiff's] work duties related to the OTCBB and Pink Sheets and Over-the-Counter Derivatives project that [plaintiff] headed since 2006 and excluded her from project meetings and precluded her from e-mails related to the project's status," and "reassigned these tasks to Heidi Pilpel, a Caucasian

employee." Compl. ¶¶ 71-72. To begin with, "a lateral transfer, without more, does not constitute an adverse employment action sufficient to establish a prima facie case of retaliation." *Jones v. D.C. Dep't of Corr.*, 429 F.3d 276, 281 (D.C. Cir. 2005). In regard to the Pink Sheets Project, defendant puts forth evidence and plaintiff does not dispute that *both* plaintiff and Pilpel were transferred away from the project. Def.'s Mot. Summ. J. 40-41. The stated purpose of plaintiff's removal from the project was for other attorneys to "take a fresh look at the issue." *Id.* Plaintiff disputes that this was the purpose behind it, but offers no facts in support of her claim. "Conclusory allegations" cannot support a claim for summary judgment. *Pub. Citizen*, 185 F.3d at 908.

> In regard to the OTC equity issues project, plaintiff does not dispute defendant's assertion
>
> that Burke-Sanow [n]ever took any action to remover her from [the] project. To the contrary, on one occasion . . . [plaintiff] sent an e-mail to Burke-Sanow asking whether she had been removed from this matter. In response, Burke-Sanow immediately sent an e-mail to [the project supervisor] reminding her to include [plaintiff] on all e-mails [r]egarding this matter.

Absent a factual challenge to this claim, the Court cannot find that plaintiff experienced a retaliatory employment action in regard to this specific project. Plaintiff also agrees that she was assigned meaningful work after beginning the EEO process, and consistently fails to pin down any specific retaliatory action at any specific point in time.

Moreover, plaintiff's only quantitatively verifiable allegations prove to be mischaracterizations, if not outright false. Plaintiff argues that

> [a]fter she filed her EEO complaint, a majority of Plaintiff's supervisors refused to work with her. *See* Ex. 13 at 36-37. As a result, there were periods of time when Plaintiff had no work, even though she sent out e-mails and went door to door asking for work. *See id.* at 36. In fact, the year after Plaintiff filed her EEO complaint, her supervisor only assigned her 13 filings. *See* Def.['s] [Ex. 44][2] at 1.

---

[2] Plaintiff cited to "Def. Att. 4 at 1," but that attachment is not even remotely related to SEC filings. The Court assumes this was a typography error and that plaintiff was referring to defendant's exhibit 44, which is an exhaustive list of filings assigned to plaintiff from 2006-2012. *See* ECF No. 42-45.

Pl.'s Opp'n to Mot. Summ. J. 33. Plaintiff filed her formal complaint of discrimination on January 24, 2007. Compl. ¶ 64. She was assigned 46 filings from January 30, 2007 to January 18, 2008 as either a principal or staff attorney: 34 as the principal attorney and 12 as a staff attorney.[3] Def.'s Ex. 44 at 1, ECF No. 42-45. Thus, the statement that in "the year after Plaintiff filed her EEO complaint[] her supervisor only assigned her 13 filings" is a mischaracterization.[4] Furthermore, these were assigned by seven different supervisors, indicating that the claim that "a majority of Plaintiff's supervisors refused to work with her" is also unsupported by the record. *Id.* Over the period of December 1, 2005 to September 6, 2012, plaintiff was assigned 403 filings. Def.'s Ex. 45 at 1, ECF No. 42-46. This ranks her fifth out of 79 OMS staff attorneys in the quantity of work performed over that broad time period, which, while not immediately relevant to plaintiff's specific allegations, supports the inference that she could not have achieved fifth-place status had there been many significant disruptions in the work assigned to her. *Id.* It is not unusual for SEC attorneys to receive only two or three filings in a month. Def.'s Ex. 46 at 66-67, ECF No. 42-47. Without any evidence as to what a reasonable SEC employee would consider a material reduction in filings, the Court cannot conclude that plaintiff suffered a materially adverse employment action. Indeed, the D.C. Circuit has ruled that a plaintiff's "retaliation claim must fail" where she offered "no evidence . . . nor even allege[d]" that her

---

[3] Contrary to her brief, plaintiff sets the relevant time frame in her Response to the Statement of Undisputed Material Facts as between "October 2006," when she first contacted the EEO office, and October 2007. Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 78. However, Defendant's Exhibit 44, beginning December 1, 2006, does not include the months of October and November 2006. ECF No. 42-45. Plaintiff's numbers all seem to be calculated with the omission of these two months. The Court cannot draw conclusions from inconclusive numbers, as plaintiff presents no evidence breaking down the filings from those two months. Therefore, the Court will consider the date the EEO action was "filed" as the beginning of the relevant time frame, as plaintiff argued in her brief.

[4] If by "supervisor" plaintiff means Burke-Sanow specifically, plaintiff's claim is still false: Burke-Sanow assigned plaintiff 17 of the 46 filings from January 2007-2008. *See* ECF No. 42-45. Plaintiff also draws a false comparison between filings assigned by Burke-Sanow ("13 filings") and all the filings plaintiff was assigned in the previous year from all supervisors ("50 filings"). Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 78.

situation was different compared to her co-workers. *Jones*, 429 F.3d at 282. Because plaintiff has provided no evidence for the Court to make a meaningful comparison, she fails to meet her burden to establish that the quantity of work assigned to her decreased in any judicially cognizable way.

Even if, as plaintiff alleges, that "there were periods of time when she did not receive assignments" and that she "contacted supervisors via e-mail and by going door-to-door asking for work," Pl.'s Opp'n to Mot. Summ. J. 33, defendant has presented factual records showing that this may result through non-discriminatory circumstances to any employee. "[Plaintiff] was not the only employee who sought additional assignments. Whether employees were busy or could take on additional work was often a subject of discussion in managerial meetings. Att. 23, pp. 35-36, 38; Burke-Sanow Notebooks (Att. 24), pp. 611-12, 614, 618, 624, 647-48, 654, 656, 663, [6]71, 673, 688-89, 704, 746, 775, 804, 819." Def.'s Mot. Summ. J. 43. It is common sense that the quantity of work available in an office fluctuates in response to various changes in the economy or even the season, *see also* Def.'s Ex. 23 at 19, ECF No. 42-23 (Burke-Sanow testifying that "I personally have to have work to give work."), and normally "[a]n employer has discretion to assign work to equally qualified employees so long as 'the decision is not based upon unlawful criteria," *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259 (1981)). All considered, the D.C. Circuit's guidance in *Jones* is equally applicable here where plaintiff does not provide evidence that her situation was different than that of her co-workers. Plaintiff is unable to establish that she would have received more work had there been no underlying discrimination dispute, *see Nassar*, 133 S. Ct. at 2533, and also presents no evidence corroborating her claim that the time period when she allegedly received less work was related to

any protected EEO action. Plaintiff therefore fails to meet her burden in proving that any lapse in work was caused by her following through with the EEO process. Because plaintiff fails to carry her burden of establishing a prima facie case and refuting defendant's evidence as pretextual, the Court cannot conclude that any reduction in plaintiff's work was retaliatory. Therefore, the Court will grant defendant's request for summary judgment insofar as it relates to count III of plaintiff's complaint.

## CONCLUSION

For the aforementioned reasons, defendant's motion to amend its answer will be GRANTED, and plaintiff's request for additional discovery and attorneys' fees will be DENIED. Further, defendant's motion for summary judgment will be GRANTED. This case will be DISMISSED with prejudice.

A separate order will be issued alongside this opinion reflecting the relief contemplated herein.

Signed September 8, 2014 by Royce C. Lamberth, United States District Judge.